IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


BRAD ALAN MORSE                                                    PLAINTIFF


           v.                          CIVIL NO. 16-2285


NANCY A. BERRYHILL,[1] Commissioner
Social Security Administration                                     DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Brad Alan Morse, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claims for a period of disability and disability insurance benefits

(DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and

XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether

there is substantial evidence in the administrative record to support the Commissioner's

decision.  See 42 U.S.C. § 405(g).

**I.      Procedural Background**:

Plaintiff protectively filed his current applications for DIB and SSI on October 17,

2014, alleging an inability to work since January 15, 2012,[2] due to neuropathy, swelling,

numbness, diabetes mellitus, morbid obesity, sleep apnea, hypertension, depressive disorder,

gastroesophageal reflux disease (GERD), tinnitus and otitis.  (Tr. 80-81, 228, 234).  An

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as
Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

[2] Plaintiff, through his attorney, amended his alleged onset date to May 1, 2013. (Tr. 14, 44, 51).

administrative video hearing was held on August 24, 2015, at which Plaintiff appeared with counsel and testified. (Tr. 41-77).

By written decision dated October 14, 2015, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 16). Specifically, the ALJ found Plaintiff had the following severe impairments: obesity; diabetes mellitus; degenerative joint disease, bilateral knees; degenerative disc disease; polyneuropathy; obstructive sleep apnea; and dysthymic disorder. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 17). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can only occasionally stoop, kneel, crouch, and crawl; he cannot be exposed to hazards, such as dangerous machinery; and he cannot use foot controls with his bilateral lower extremities. Additionally, he is limited to performing simple tasks, with only occasional changes, in a routine work setting.

(Tr. 19). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a small product assembler and a document preparer. (Tr. 24).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which after reviewing additional evidence submitted by Plaintiff denied that request on October 26, 2016. (Tr. 1-7). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 12, 13).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the administrative hearing held on August 24, 2015, Plaintiff testified that he was forty-four years of age and had obtained a high school education. (Tr. 46-47). Plaintiff's past relevant work consists of work as a public works director, and a truck driver. (Tr. 71).

Prior to the relevant time period, Plaintiff sought treatment for various medical conditions. The medical records for the time period in question reflect the following. In a letter dated July 8, 2013, John D. Wright, DPM, indicated that he evaluated and treated Plaintiff for an infected ingrown hallux nail. (Tr. 391, 505-506). Dr. Wright noted that the lateral aspect of Plaintiff's right hallux was incurvated into the adjacent nail border with erythema and hypertrophy. Examination notes indicated Plaintiff had an antalgic, abnormal gait. Dr. Wright indicated that a matrixectomy procedure was performed and it was anticipated that this would heal uneventfully.

On September 12, 2013, Plaintiff underwent a mental diagnostic evaluation performed by Patricia J. Walz, Ph.D. (Tr. 398-402). Plaintiff reported problems with his feet and reported that at one point thought he was going to lose a toe due to infection. Plaintiff reported experiencing depression all the time. Plaintiff reported no problems with memory or concentration. Plaintiff reported a history of three DWI's, the most recent being the night before the evaluation. Plaintiff reported that he had been applying for jobs. Plaintiff reported his longest job was for fourteen years and that he got along with his bosses and coworkers. Plaintiff reported that he was diagnosed with diabetes, and that he experienced neuropathy in both his hands and feet. Dr. Walz noted Plaintiff lived in his home and that he sometimes needed help putting on socks. Plaintiff reported that he did not need to be reminded to bathe, that he dressed every day, and that he used a glucometer but no other special medical

equipment. Plaintiff reported that he did chores as best he could and would work in only "ten minute spurts." Plaintiff reported that he had trouble sleeping due to foot and hand pain. Plaintiff reported that he tried to get exercise by using a push lawn mower in the front yard "a little bit." Plaintiff reported having problems with alcohol but lately had only been drinking occasionally due to the lack of finances. Plaintiff indicated that he had received three DWI's but had not lost a job due to alcohol. Dr. Walz opined Plaintiff's IQ fell in the low average range.

With respect to adaptive functioning, Dr. Walz noted Plaintiff was not driving on the day of the evaluation due to the DWI the previous night. Plaintiff reported it took him three times to pass the written test to get his driver's license when he was fourteen. Dr. Walz noted Plaintiff was able to shop independently. Plaintiff reported he did not have many friends and did not belong to clubs or organizations. Dr. Walz noted Plaintiff's attention and concentration were slightly impaired on the day of the evaluation but Plaintiff persisted well. Plaintiff's speed of information processing was noted to be a bit slow.

On September 19, 2013, Plaintiff was seen by Dr. Michael R. Westbrook. (Tr. 612). Plaintiff complained of a bruise across his lower back that continued to get bigger. Dr. Westbrook indicated Plaintiff had a normal physical exam. X-rays revealed degenerative disc disease at L-5.

On September 25, 2013, Plaintiff underwent a general physical examination performed by Dr. Clifford Lamar Evans. (Tr. 406-410). Plaintiff complained of pain in his lower back, hands and feet. Upon examination of Plaintiff's spine and extremities, with the exception of Plaintiff's lumbar spine flexion, Dr. Evans noted Plaintiff had normal range of motion. Dr.

4

Evans found no presence of muscle spasm and negative straight leg tests, bilaterally. Plaintiff exhibited no muscle atrophy, but Dr. Evans noted leg raises caused pain in Plaintiff's lower back. Upon a limb function evaluation, Dr. Evans reported Plaintiff was able to hold a pen and write; to touch fingertips to palm with pain in both hands; to grip; to oppose thumb to fingers with pain in both hands; to pick up a coin; and to stand and walk without assistive devices. Plaintiff was unable to walk on heel and toes or to squat and arise from a squatting position due to weakness and poor balance. Dr. Evans indicated that Plaintiff needed a thyroid profile. Dr. Evans opined that Plaintiff had moderate limitations of the body as a whole due to generalized pain in the back and knee with numbness and paresthesia of the fingers and feet.

On October 4, 2013, Plaintiff was seen by Dr. Wright for his three-month check-up and to have his nails trimmed. (Tr. 504, 523). Dr. Wright noted Plaintiff was ambulatory.

On November 8, 2013, Plaintiff was seen by Nurse Laura Henson, A.P.N., to establish care. (Tr. 532-535). Plaintiff complained of pain in his feet, that his hands hurt and locked up and that his right big toe needed to be checked. Nurse Henson noted Plaintiff reported increased depression and that he was in pain all of the time. Plaintiff reported his hands and feet hurt and burned. Plaintiff reported he took his medication as prescribed, that he watched his diet and that he knew his obesity caused his pain to be worse. Upon examination, Nurse Henson noted Plaintiff's musculoskeletal system was normal with no apparent abnormalities. Plaintiff's gait and station were normal. Plaintiff was informed that chronic pain would need to be treated by a pain management clinic.

On November 19, 2013, Plaintiff underwent a flexor tenotomy of the second, third, fourth and fifth left digit. (Tr. 510). Dr. Wright instructed Plaintiff to return in one week for a check-up.

On December 19, 2013, Plaintiff was seen by Nurse Henson for his hands and feet and trouble sleeping. (Tr. 530-532). Plaintiff reported experiencing difficulty going to and staying asleep. Upon examination, Nurse Henson noted Plaintiff's musculoskeletal system was normal. Plaintiff's gait and station were normal, as was his affect. Nurse Henson assessed Plaintiff with chronic pain in the hands and feet, observed snoring, insomnia due to environmental disturbances, essential hypertension, morbid obesity and disturbance of hand sensation, bilaterally. Nurse Henson indicated that Plaintiff would undergo a sleep study.

On January 7, 2014, Plaintiff underwent a flexor tenotomy of the second, third, fourth and fifth right digit and a debridement of the right heal. (Tr. 509).

On January 14, 2014, Plaintiff was seen in the Sparks Sleep Disorder Center for a consultation. (Tr. 416-418, 558-578). Plaintiff reported poor sleep for years and that he had to sleep semi-upright in a recliner. Plaintiff complained of pedal edema, as well as numbness and a restless feeling in his feet, which had been significantly helped with gabapentin. Plaintiff was noted to have a normal gait and station with an intact fund of knowledge and short-term memory. Dr. Duane Birky assessed Plaintiff with obstructive sleep apnea syndrome and restless leg syndrome. Dr. Birky noted that Plaintiff's restless legs were already better with the use of gabapentin. He recommended Plaintiff use a CPAP and return to the clinic in several weeks. Plaintiff was prescribed a CPAP on January 31, 2014. (Tr. 557).

On January 21, 2014, Plaintiff was seen for a check-up following a flexor tenotomy. (Tr. 521-522). Dr. Wright observed an antalgic and abnormal gait.

On January 29, 2014, after complaining of numbness in both hands and all fingers, as well as polyneuropathy in both feet, Plaintiff underwent nerve conduction studies. (Tr. 429-470, 542-556). Plaintiff demonstrated findings consistent with a polyneuropathy process in both upper extremities.

On February 12, 2014, Plaintiff underwent a flexor tenotomy of the right hallux and a flexor tenotomy of the fourth, right digit. (Tr. 508). Dr. Wright noted Plaintiff understood the importance of post-op exercises to allow the flexor tendons to heal in a strengthened position.

On March 11, 2014, Plaintiff was seen for a check-up for his right, Achilles tendon area. (Tr. 519-520). Plaintiff was noted as being ambulatory.

On April 8, 2014, Plaintiff was seen for an ulcer check-up. (Tr. 517-518). Plaintiff had concerns about a spot on his left great toe.

On April 10, 2014, Plaintiff was seen by Nurse Henson for a medication refill and check-up. (Tr. 599-600). Plaintiff complained of severe pain in his hands. Plaintiff reported that his congestion and cough also made it difficult to wear his CPAP mask. Nurse Henson noted that Plaintiff reported he took his medication as prescribed, but later contradicted himself and reported which medication he took and how often. Nurse Henson noted Plaintiff had been unsuccessful with getting his disability approved. Upon examination, Nurse Henson noted Plaintiff had a normal musculoskeletal system and a normal gait and stance.

On May 16, 2014, Plaintiff underwent a flexor tenotomy of the left hallux performed by Dr. Wright. (Tr. 507). Plaintiff was asked to return in one week for a check-up.

On August 15, 2014, Plaintiff was seen by Dr. Wright for a follow-up appointment. (515, 639). Dr. Wright indicated Plaintiff was ambulatory.

On August 19, 2014, Plaintiff was seen by Dr. Wright and instructed on diabetic foot care. (516, 640).

On August 28, 2014, Plaintiff was seen by Nurse Henson for a check-up. (Tr. 598-599). Plaintiff reported that his left knee was "popping" loudly and he felt like it was going to give out on him. Plaintiff reported his knee pain was the worst it had ever been and that he had difficulty rising up on the knee or using stairs. Plaintiff further reported that his restless leg was bothering him more, and he noticed that it was not just happening when he was in bed. Plaintiff reported that the burning pain in his hands was not better and that he was miserable all the time. Upon examination, Nurse Henson noted Plaintiff's musculoskeletal system was normal and no coordination or cerebellum abnormalities were noted. Plaintiff also exhibited a normal gait and stance. Plaintiff was diagnosed with left knee joint pain, type two diabetes mellitus, essential hypertension, chronic pain in his hands and feet, morbid obesity, depression and idiopathic peripheral neuropathy. Plaintiff was advised that he might need to see an internal medical doctor instead of being treated at the clinic.

On September 3, 2014, after complaining of pain in the left knee and lower leg, Plaintiff underwent x-rays of the left knee. (473-483). A mild degenerative change with a small joint effusion was observed.

On September 5, 2014, Plaintiff had his right great toenail removed. (513-514, 637-638). Dr. Wright noted Plaintiff was ambulatory.

On September 23, 2014, Plaintiff was seen by Dr. Wright as he was afraid that his toe was not healing. (Tr. 495-496, 511-512, 635-636). Plaintiff reported that his toe was red, swollen and draining. Plaintiff also wanted his left hallux checked as he had bumped it on a table. Dr. Wright noted Plaintiff was ambulatory.

On September 23, 2014, Dr. Wright also completed a physical residual functional capacity evaluation opining that Plaintiff could perform less than sedentary work. (Tr. 380-383, 621-624). Dr. Wright noted that Plaintiff was a diabetic with a history of ulceration and weakness in his lower extremities.

On October 9, 2014, Plaintiff was seen by Nurse Henson for a medication refill. (Tr. 597-598). Plaintiff reported his hand pain had not improved with the use of Mobic. Plaintiff also reported hearing loss in his right ear, along with "ringing" or "chirping" noises. Plaintiff indicated the hearing problem had been around for years and he had just forgotten to report it. Plaintiff reported he had been eating a healthier diet and had been losing weight but these changes had not helped his back or joint pain yet. Nurse Henson noted Plaintiff had recently seen a podiatrist and had taken two rounds of antibiotics for an infected toenail. Upon examination, Nurse Henson noted Plaintiff appeared to be developing an infection in his left ear. Nurse Henson noted Plaintiff's musculoskeletal system was normal and she observed no abnormalities. Plaintiff had a normal gait and stance. Plaintiff was prescribed medication and referred to an audiologist.

On October 14, 2014, Plaintiff underwent audio logic testing. (Tr. 499, 538-539). Plaintiff was instructed to follow up with Dr. Kelli Rippy, and to consider a trial of amplification.

On November 6, 2014, Plaintiff complained of knee pain and other problems. (Tr. 529-530, 596-597, 613-614, 643-644). Nurse Henson noted Plaintiff's complaints of increased knee, hand and feet pain, as well as, tingling in the upper arm. Upon examination, Nurse Henson noted Plaintiff's musculoskeletal system, gait and stance were normal. Plaintiff was assessed with type two diabetes mellitus, essential hypertension, left knee joint pain, depression and morbid obesity. Plaintiff was encouraged to increase exercise and lose weight to aid in overall less pain and increased health.

On November 18, 2014, Plaintiff reported that he hit his right great toe on a table the previous day and that it was swollen, red and painful. (Tr. 493-494, 497, 633-634, 641). Plaintiff underwent x-rays of his right foot. Dr. Wright noted there was a possible lucent line on the distal medial aspect of the proximal phalanx of the right hallux. No displacement was noted.

On December 2, 2014, Plaintiff was seen for a two-week check-up on his right great toe. (Tr. 491-492, 631-632). Plaintiff also had his nails trimmed. Dr. Wright noted Plaintiff was ambulatory.

On December 6, 2014, Plaintiff was seen for a check-up for his right great toe. (Tr. 489-490, 629-630). Dr. Wright noted Plaintiff was ambulatory.

On December 11, 2014, Plaintiff underwent a general physical examination performed by Dr. Westbrook. (Tr. 581-586). Plaintiff complained of numbness and tingling in his hands

and feet due to diabetic neuropathy, swelling in his lower legs and feet, diabetes, high blood pressure, obstructive sleep apnea, tinnitus, GERD, low back pain and bilateral knee pain. Upon examination of Plaintiff's spine and extremities, Dr. Westbrook noted Plaintiff's range of motion was within normal limits. Dr. Westbrook found no presence of muscle spasm and negative straight leg tests, bilaterally. Plaintiff exhibited no muscle atrophy or weakness. Dr. Westbrook noted Plaintiff had stocking type sensory loss and exhibited an unsteady gait. Upon a limb function evaluation, Dr. Westbrook reported Plaintiff was able to hold a pen and write; to touch fingertips to palm; to grip sixty percent of normal; to oppose thumb to fingers; to pick up a coin; and to stand and walk without assistive devices but noted Plaintiff's unsteadiness. Plaintiff was unable to walk on heel and toes due to the recent removal of an ingrown nail and back pain. Plaintiff was unable to squat and arise from a squatting position due to back and knee pain. After reviewing x-rays of Plaintiff's knees and lumbar spine, Dr. Westbrook diagnosed Plaintiff with diabetes mellitus, type two, back pain, obesity, diabetic neuropathy and GERD.

On December 17, 2014, Plaintiff underwent a second mental diagnostic evaluation performed by Dr. Walz. (Tr. 587-590). Dr. Walz noted she had previously evaluated Plaintiff on September 12, 2013. Plaintiff reported he had applied for disability due to pain in his feet, back and hands. Plaintiff denied mental health problems but reported experiencing depression. Plaintiff reported he had not undergone counseling because he did not want to go but he was taking Amitriptyline and Wellbutrin. Plaintiff reported that his diabetes and blood pressure were managed with medication. Plaintiff reported that he took gabapentin for pain and did not feel that it managed his pain well. Plaintiff indicated that he lived with his seventeen-year-old daughter. Plaintiff indicated he needed help with putting on socks, as he was unable to bend

over.  Plaintiff reported he had lost thirty pounds over the past six months by dieting.  Plaintiff reported an inability to exercise because his legs tingled and hurt.  Plaintiff reported that he had always had problems with alcohol and that he drank once a week and would drink up to a twelve-pack.  Plaintiff also used chewing tobacco and went through a can every three to four days.  Dr. Walz opined Plaintiff's intellectual functioning was in the low average range. Dr. Walz diagnosed Plaintiff with persistent depressive disorder (dysthymia) and alcohol abuse disorder.

With respect to Plaintiff's adaptive functioning, Dr. Walz noted Plaintiff was able to drive.  However, due to his neuropathy, Plaintiff reported he was not able to tell the difference between the gas and brake pedals so he limited his driving.  Plaintiff reported that he left the house once a week to go to town with his mother and his aunt.  Dr. Walz noted Plaintiff's attention and concentration were intact and his speed of information processing was average.

On January 1, 2015, Dr. Kristin Jarrard, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative or environmental limitations were not evident. (Tr. 105-106).  On March 6, 2015, after reviewing the record, Dr. Sharon Keith affirmed Dr. Jarrard's opinion. (Tr. 124-126).

On February 12, 2015, Plaintiff presented with complaints of a fever, cough and yeast in his ears. (Tr. 595-596, 617-619, 647-649). Plaintiff reported he had been out of his blood

pressure medication for two days so his blood pressure was up.  He also requested a referral to pain management as he had intolerable hand and foot pain.  Upon examination, Nurse Henson noted Plaintiff's lungs revealed a course cough. Plaintiff's cervical spine rotation was not diminished and Plaintiff exhibited a normal gait and stance.  Plaintiff's mood was noted as euthymic and his affect was normal.  Nurse Henson noted white, flaky skin in Plaintiff's outer ear canals.  Plaintiff was assessed with an acute upper respiratory infection, a cough, type two diabetes mellitus, essential hypertension, and chronic pain in the hands and feet.

On February 26, 2015, Plaintiff was seen by Dr. Wright for a two-month check-up and nail trim. (Tr. 627-628).  Plaintiff complained of a possible splinter in his right hallux.  Dr. Wright observed that Plaintiff had an antalgic, abnormal gait. Dr. Wright also prescribed a cane.  (Tr. 660).

On May 11, 2015, Plaintiff was seen for his two-month follow-up appointment with Dr. Wright.  (Tr. 625-626, 661). Plaintiff was found to have a diabetic ulcer on the right foot. Dr. Wright noted Plaintiff was ambulatory.

On June 4, 2015, Plaintiff was seen by Nurse Henson for a check-up and at that time had multiple complaints.  (Tr. 651-653).  Plaintiff reported a worsening of his joint, hand and feet pain.  Plaintiff reported that his podiatrist told him that he qualified for disability for his feet and would fill out the paperwork. Nurse Henson noted that Plaintiff saw Dr. Wright routinely but her office had never received a copy of any reports.  Plaintiff thought his uvula was too big as he was choking on food, primarily meats, and could not breathe when he was choking.  Plaintiff reported that his attorney told him that his primary care doctor should also complete the disability paperwork. Plaintiff also reported hot flashes and night sweats.  Upon

examination, Nurse Henson noted Plaintiff exhibited no coordination/cerebellum abnormalities and that he had a normal gait and stance. Nurse Henson recommended Plaintiff see an ENT for an evaluation of his choking. Nurse Henson was also trying to get Plaintiff to a pain management doctor and noted the first two referrals would not take Plaintiff. Nurse Henson told Plaintiff that she would not complete the disability paperwork.

On June 22, 2015, Plaintiff was seen for a foot check-up. (662-663). Dr. Wright noted the wounds on Plaintiff's feet looked dried and were almost healed. Plaintiff reported that his right second digit hurt. Plaintiff was seen on August 4, 2015, for a foot check-up. (Tr. 664-665).

On October 22, 2015, after the relevant time period, Plaintiff underwent a grip exam that revealed grip deficiencies. (Tr. 668).

## III. Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent

positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d) (1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d) (3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

## IV.    Discussion:

Plaintiff argues the following issues on appeal: 1) the ALJ made an improper RFC finding; and 2) the ALJ did not prove that there are other jobs that Plaintiff can perform.

### A.    Plaintiff's Impairments:

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. <u>See</u> 20 C .F.R. § 404.1520(c).  While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." <u>Wright v. Colvin</u>, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. <u>See</u> Social Security Ruling 96-3p.  The claimant has the burden of proof of showing he suffers from a medically severe impairment at Step Two.   <u>See</u> <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 852 (8th Cir.2000).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments during the time period in question, the ALJ stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe.  <u>See</u> <u>Swartz v. Barnhart</u>, 188 F. App'x 361, 368 (6th Cir. 2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as "severe" at step two is harmless); <u>Elmore v. Astrue</u>, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); <u>see also</u> 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").  After

reviewing the record, the Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

### B.    Subjective Complaints and Symptom Evaluation:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  In assessing Plaintiff's subjective complaints, the ALJ acknowledged that Plaintiff does have limitations. However, the ALJ also pointed to the record that revealed Plaintiff was able to bathe and dress himself, noting that he needed help with socks sometimes; to prepare simple meals; to do laundry and light household cleaning; to drive a little; to manage household finances; and to use a push lawn mower.

With respect to Plaintiff's alleged physical impairments, the record revealed that Plaintiff was treated conservatively and appeared to experience some relief with the use of medication.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); See Robinson v. Sullivan,

956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). The medical records indicate that Plaintiff underwent tenotomy procedures to correct hammertoe deformities in November of 2013, January of 2014, and May of 2014. Each procedure was completed without incident. Medical records dated after these procedures revealed Plaintiff had a normal gait and station, as well as normal musculoskeletal examinations.

With respect to Plaintiff's alleged mental impairments, a review of the record failed to establish that Plaintiff sought on-going and consistent treatment from a mental health provider during the time period in question. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability). In determining Plaintiff's RFC, the ALJ noted Dr. Walz's opinion that Plaintiff was functioning in the low average range of intellectual functioning and included mental limitations that were supported by the record.

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

## C.    ALJ's RFC Determination and Medical Opinions:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from

symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

"The [social security] regulations provide that a treating physician's opinion ... will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (citations omitted). An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Id. at 1013. Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighting. Id. (citing 20 C.F.R. § 404.1527(d)(2)).

In the present case, the ALJ considered the medical assessments of treating, examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform sedentary work with limitations. The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of treating, examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and

examining physicians")(citations omitted); <u>Prosch v. Apfel</u>, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

Plaintiff argues that the ALJ improperly discounted Dr. Wright's September 23, 2014, Physical Residual Functional Capacity Evaluation, opining that Plaintiff could perform less than sedentary work. While Plaintiff argues that Dr. Wright's assessment is in line with his treatment notes and Plaintiff's medical records, a review of Dr. Wright's treatment notes revealed that Plaintiff was noted to have an abnormal gait on only two occasions, July 8, 2013, and February 26, 2015. (Tr. 506, 628). The remaining treatment notes completed by Dr. Wright failed to indicate Plaintiff's gait was impacted. Plaintiff was prescribed a cane in February of 2015; however, a review of Dr. Wright's treatment notes indicate Plaintiff was ambulatory and failed to show Plaintiff needed a cane to ambulate. Nurse Henson also repeatedly found Plaintiff had normal musculoskeletal examinations, as well as a normal gait and stance. (Tr. 530, 532, 597-600, 614, 652). After review, the Court finds that the ALJ did not err in giving the opinion of Dr. Wright little weight. The ALJ declined to give controlling weight to Dr. Wright's opinion for good and well-supported reasons. See <u>Goff v. Barnhart</u>, 421 F.3d 785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [the treating physician's] opinion."). The ALJ also took Plaintiff's obesity into account when determining Plaintiff's RFC. <u>Heino v. Astrue</u>, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal).

Plaintiff also argues the ALJ erred in failing to include upper extremity limitations in the RFC. As discussed above, a review of Plaintiff's medical records revealed normal

musculoskeletal examinations consistently throughout the time period in question. While Dr. Westbrook found Plaintiff had a sixty percent of normal grip strength in December of 2014, at that time Plaintiff was also able to hold a pen and write, touch fingertips to palm, and oppose thumb to fingers and pick up a coin. Plaintiff submitted a grip test dated after the ALJ's decision that appears to reveal Plaintiff has decreased grip strength; however, based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination for the time period in question.

### D. Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. <u>Goff v. Barnhart</u>, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a small product assembler and a document preparer. <u>Pickney v. Chater</u>, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### V. Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal**

questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 9th day of November 2017.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE